# In the United States Court of Federal Claims

No. 26-213
(Filed under seal: February 27, 2026)
(Reissued for Publication: March 24, 2026)[1]

```
***************************************
ABACUS TECHNOLOGY CORPORATION,    *
                                  *
               Plaintiff,         *
                                  *
v.                                *
                                  *
THE UNITED STATES,                *
                                  *
               Defendant,         *
                                  *
and                               *
                                  *
GENERAL DYNAMICS INFORMATION      *
TECHNOLOGY INC.,                  *
                                  *
               Defendant-Intervenor.  *
***************************************
```

*Alexander Brewer Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, counsel for Plaintiff. With whom was *Robert C. Starling*, of counsel.

*Reta Emma Bezak*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Steven Haubner* and *Meaghan LeClerc*, U.S. General Services Administration, and *Captain Sara E. Bennet*, U.S. Army Legal Services Agency, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

Abacus Technology Corporation ("Abacus") challenges an alleged decision by the United States General Services Administration ("GSA") to not competitively procure information technology services currently performed by Abacus in support of the United States Military Training Mission ("USMTM") in Saudi Arabia. Abacus argues that GSA's decision to in-source and transition the services to the existing Enterprise Mission Information Technology Services 2

---

[1] This Opinion and Order was filed under seal on February 27, 2026, *see* [ECF 26], in accordance with the Protective Order entered on February 13, 2026, *see* [ECF 15]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on March 12, 2026, with agreed upon proposed redactions. [ECF 31]. The Court accepts the proposed redactions. All redactions are indicated by bracket asterisks, e.g., "[* * *]."

("EMITS 2") task order performed by General Dynamics Information Technology, Inc. ("GDIT") is contrary to law. Before the Court is the government's motion to dismiss Abacus's complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The government asserts that Abacus's protest is not ripe because GSA and USMTM have not made a final decision on how to procure the follow-on services. For the reasons stated below, the Court finds that Abacus's claims are ripe and therefore **DENIES** the government's motion.

## I.    BACKGROUND

On March 22, 2021, GSA awarded Abacus a contract to provide Communication and Information Technology Services ("CITS") to USMTM in Saudi Arabia. Am. Compl. [ECF 21-1] ¶ 14; Compl. Ex. [ECF 1-2] at 2.[2] Abacus has performed these services for USMTM under different contract vehicles since 2010. [ECF 21-1] ¶ 16. The 2021 contract included four option years and an optional six-month extension. [ECF 1-2] at 5-6. The government exercised all the option years but has not exercised the six-month extension. *See* [ECF 21-1] ¶ 19. The contract expires on March 22, 2026. [ECF 1-2] at 5.

On October 23, 2025, Abacus emailed GSA "to inquire about [GSA's] future acquisition plan with respect to the scope of work under the [i]ncumbent [c]ontract." [ECF 21-1] ¶ 20; [ECF 1-2] at 89. In the email, Abacus stated that it was "sort of in the dark regarding the follow on situation for the USMTM CITS" and that it "ha[s] learned . . .  that there will be no recompete as GSA is not taking/doing any new contracts." [ECF 21-1] ¶ 21; [ECF 1-2] at 89. Abacus further stated its understanding that "a task order will be issued under an existing contract" and requested confirmation from GSA. [ECF 21-1] ¶ 21; [ECF 1-2] at 89. GSA responded the next day, indicating that Abacus's representation was "somewhat correct" and that GSA "anticipate[d that] some or all of the USMTM requirements may transition under an already awarded task order." [ECF 21-1] ¶ 22; [ECF 1-2] at 88. GSA also stated that Abacus could contact "the Transition Manager / Operations Manager for the active task order," but noted "that the specific requirements have not yet been defined, so [he] may have limited information at this stage." [ECF 21-1] ¶ 22; [ECF 1-2] at 88. In a follow-up email, GSA provided Abacus with contact information for this individual, who was identified as a senior program manager and the EMITS 2 transition manager / operations manager for GDIT. [ECF 21-1] ¶ 23; [ECF 1-2] at 87.

On November 3, 2025, Abacus filed an agency-level protest with GSA arguing that the EMITS 2 task order "has a materially different geographical scope" than the services performed under Abacus's incumbent contract. [ECF 1-2] at 223; [ECF 21-1] ¶ 33. According to Abacus, the GSA's "plan to modify the EMITS 2 task order rather than conducting a competition – in addition to constituting a clear [Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301,] violation – would deny Abacus a fair opportunity to compete for work that it has successful performed for years." [ECF 1-2] at 223. Thereafter, on November 12, 2025, the GSA contracting officer denied the protest, stating that "EMITS 2 defines scope by mission and function rather than by a fixed geographic boundary," *id.* at 223, and that the work performed under Abacus's contract "falls within the anticipated geographic and mission framework of EMITS 2," *id.* at 224. The contracting officer further stated that "[t]he services at issue will be performed under the

---

[2] All page numbers cited from the filings on the docket refer to the page numbers generated by the CM/ECF system.

existing task-order structure, using established contract types, CLIN structures, and labor categories . . . [and that] the contemplated work remains within the original scope, period, and maximum value of the existing [EMITS 2 task order]." *Id.* at 224. The contracting officer concluded that "[t]he [g]overnment's consideration of utilizing [the] EMITS 2 [task order] at the conclusion of the USMTM CITS contract . . . does not violate CICA." *Id.*

On November 17, 2025, Abacus filed a protest at the U.S. Government Accountability Office ("GAO") raising the same arguments. [ECF 21-1] ¶ 36. GSA subsequently requested dismissal of the protest on the grounds that it was premature. *Id.* ¶ 37. GAO dismissed the protest on December 16, 2025, stating that "[t]he protester has not . . . demonstrated that the agency has made a final decision regarding this procurement or taken a final action to award this work to a sole source." *Id.*; Def.'s Mot. to Dismiss Ex. [ECF 13-1] at 3. Following GAO's dismissal, Abacus continued to inquire about the status of the USMTM CITS procurement. [ECF 21-1] ¶ 38.

On January 26, 2026, GSA requested that Abacus "execute the transition out plan, facilitating [its] transition out activities with government personnel (USMTM J6) and ultimately fulfilling [its] transition out plan by the expiration of the contract on March 22, 2026. [ECF 21-1] ¶ 39 (capitalization omitted). Abacus then filed a second GAO protest, challenging GSA's decision to not compete the USMTM CITS support. *Id.* ¶ 40. After Abacus filed its second protest, GSA indicated that it did not intend to extend Abacus's contract performance. *Id.* ¶ 41. On February 6, 2026, Abacus withdrew its protest and filed a complaint in this Court. *Id.* ¶ 42; Compl. [ECF 1]. In its complaint, Abacus claimed that GSA's plan to not compete the USMTM CITS support and instead execute an out-of-scope modification of the EMITS 2 task order violates CICA. *Id.* ¶¶ 40-64. Thereafter, on February 10, 2026, Abacus filed a motion requesting "that the Court issue a temporary restraining order and a preliminary injunction enjoining GSA from continuing Abacus'[s] transition off the incumbent contract during the pendency of this protest." Pl.'s TRO Mot. [ECF 10] at 26 (capitalization omitted).

On February 12, 2026, the government filed a motion to dismiss and a response in opposition to Abacus's request for injunctive relief. Def.'s Resp. & Mot. to Dismiss [ECF 13]. The government argued that "[t]he Court should . . . dismiss Abacus's protest as unripe and otherwise for a lack of subject matter jurisdiction." *Id.* at 7. According to the government, "[t]here is . . . no procurement decision to protest," and "[t]he only decision that has been made is to allow Abacus's current contract to end on its planned termination date, a decision that is not protestable. . . ." *Id.* The government included a declaration by the GSA contracting officer, wherein she described the status of the follow-on procurement as follows:

> USMTM has communicated to GSA that it expects to continue to require the mission support services currently provided under the contract. USMTM further represented to GSA that it has internal or external military resources available to address a potential lapse in contractor support upon expiration of the current contract. In addition, USMTM has represented to GSA that it has the tools and systems that would enable them to maintain mission-essential continuity for an interim period, though in a potentially limited

capacity, with internal or external support needed. They have advised that this approach, while not ideal, could be adequate as a temporary solution while refining their revised requirement for contracted support. If USMTM determines that continued contractor support is required after further refinement of its needs, such support could potentially be addressed either through pursuit of a contracting action by USMTM's own contracting activity or placement under an appropriate existing contract vehicle. USMTM has not communicated a determination to GSA to date.

On January 29, 2026, USMTM further advised GSA that it did not wish to pursue an extension of services . . . with the incumbent contractor. On February 11, 2026, the USMTM J6 Director expressed support for a course of action that does not include extension of the existing contract . . . even if that approach may result in a temporary gap in contractor-provided services. The USMTM J6 is responsible for Command, Control, Communications, and Computers/Cyber (C4/Cyber), and essentially, the J6 [* * *], vital for the USMTM's mission. The J6's decision is based on USMTM senior leadership's assessment that:

> (a) USMTM can provide interim continuity of essential IT support through internal or external military, government, or other resources while it determines the appropriate long-term acquisition approach;

> (b) USMTM is still refining and validating future requirements, including scope, staffing, and performance standards;

> (c) [Extending the incumbent contract] would obligate substantial additional funding for services under the existing [performance work statement] that USMTM believes no longer fully aligns with its evolving mission needs.

***

> As of the date of this declaration, no solicitation has been issued, and no follow-on contract has been awarded for successor performance.

Decl. [ECF 13-2] ¶¶ 22-23, 26.

On February 17, 2026, Abacus filed an amended complaint to include an additional claim alleging that GSA's and USMTM's plan to utilize government resources to perform the USMTM CITS support constitutes improper in-sourcing "in violation of either or both of 10 U.S.C. § 129a(g) and 10 U.S.C. § 2463(e)." [ECF 21-1] ¶¶ 73-84. Abacus also responded to the

4

government's motion to dismiss and, alternatively, moved to compel the government to produce the administrative record for jurisdictional discovery. Pl.'s Resp. & Mot. to Compel [ECF 22]. Abacus contends that "the evidence reflects that GSA's decision to procure Abacus'[s] incumbent work under EMITS 2 constitutes final agency action," *id.* at 6, and that "[i]f the Court finds GSA's plan to move Abacus'[s] incumbent work to EMITS 2 not to be sufficiently final for the exercise of jurisdiction, then GSA's in-sourcing plan must be considered a final agency action," *id.* at 11. Further, Abacus argues that "[i]f the Court is unsure whether the facts of this case reflect final agency action . . . production of the administrative record . . . will illuminate the status of GSA's decision-making." *Id.* at 10. Additionally, Abacus withdrew its motion for a temporary restraining order and a preliminary injunction, stating that it was overcome by events and superseded by its amended complaint. *Id.* at 2.

With its response, Abacus attached a declaration by its director of engineering, wherein the director stated the following:

> Since January 26, 2026, I have had multiple conversations with USMTM personnel, including [the USMTM J6 director] regarding the Government's procurement plan for USMTM CITS.
>
> [The USMTM J6 director] represented during at least one of these conversations that the USMTM CITS services are being transitioned to the [EMITS 2] task order currently performed by [GDIT].
>
> Specifically, I spoke with [the USMTM J6 director] via telephone on February 5, 2026[,] regarding his concern that a lapse in services might occur before GSA finalizes the transition of services to EMITS 2. . . .
>
> [The USMTM J6 director] stated on that call that GDIT had presented a pricing estimate to the [g]overnment to perform USMTM CITS, and the [g]overnment viewed that estimate favorably.
>
> \*\*\*
>
> I spoke to [the USMTM J6 director] again on February 10, 2026. During this call, [he] asked whether Abacus might agree to modify its level of effort and/or pricing if the [g]overnment agreed to exercise the final six-month option in the [i]ncumbent [c]ontract. I stated that Abacus likely would agree to do so.
>
> I spoke to [the USMTM J6 director] again the next day, February 11, 2026. He stated his leadership had decided against the exercise of Abacus'[s] final [i]ncumbent [c]ontract option, based on "legal risk." He did not explain what he meant by such risk.

Decl. [ECF 22-1] ¶¶ 7-10, 12, 13. The Court held a hearing on the government's motion to dismiss on February 18, 2026, *see* Order [ECF 14], and, as directed by the Court, the government filed its reply on February 24, 2026, *see* Def.'s Reply [ECF 24].

In its reply, the government reasserted its position that "Abacus's bid protest is unripe for review because [GSA] and [USMTM] have not yet reached a final decision regarding the vehicle for any follow-on work needed subsequent to the conclusion of Abacus's current contract." [ECF 24] at 1. The government further argued that "Abacus has failed to justify its request to compel the administrative record at this stage in the protest, nor would such record shed light on the question currently before the Court." *Id.* The government included declarations from the USMTM J6 director, *see* Decl. [ECF 24-1], and the GSA contracting officer, *see* Decl. [ECF 24-2]. The USMTM J6 director stated the following:

> The current contract for these essential CITS services, presently held by Abacus, will expire in less than thirty days (specifically on 22 March 2026). Consequently, USMTM J6 has been developing and refining the objectives of a new CITS contract. . . .
>
> This new USMTM CITS contract would be similar to the Performance Work Statement of the current contract but would differ based on lessons learned and changing mission requirements. . . .
>
> USMTM's preferred course of action (COA) is to utilize the [EMITS 2] task order for its CITS support once Abacus's contract ends. If, however, the transition to EMITS 2 is not feasible due to this bid protest, USMTM has identified four alternate COAs to secure CITS support services:
>
>> (a) First, USMTM could pursue a short-term bridge contract for a period of six months to one year. Because the value of the contract would be under $5 million, USMTM believes this contract could be awarded in approximately ninety days.
>>
>> (b) Second, USMTM could solicit a full-and-open, five-year contract for support services, including option years. This standard process would take approximately six months to prepare, solicit bidders, and award.
>>
>> (c) Third, USMTM could utilize an existing [GSA] contract vehicle. This would allow USMTM to be onboarded into an existing contract, potentially minimizing a gap in support to approximately sixty days.
>>
>> (d) Fourth, USMTM could create a Blanket Purchase Agreement to request individual services for Network

> Administration, System Administration, and [Voice over Internet Protocol] services to respond to emergency request outages that are beyond the remedial capabilities of the USMTM J6 staff.
>
> Any COA that results in a lapse in services and fails to ensure a seamless and immediate transition to a new CITS contract will directly and negatively impact USMTM's mission. Yet, recognizing a gap for some amount of time is likely inevitable, USMTM J6 has devised an internal mitigation plan for how it will use its existing staff to maintain operational capability once all nineteen Abacus contractor personnel depart Saudi Arabia. USMTM's primary objective under this plan is to maintain only the most critical network operations and core services. A significant degradation in service levels is anticipated and unavoidable. Nevertheless, USMTM J6 is postured, for an interim period and as a temporary solution, to ensure a structured handover, mitigate the most critical risks, and define a sustainable, albeit degraded, operating model using its assigned [g]overnment [s]ervice and [f]oreign [n]ational personnel.

[ECF 24-1] ¶¶ 4-7. The GSA contracting officer explained that GSA's Assisted Acquisition Services ("AAS") "provides contracting support to . . . federal agencies," [ECF 24-2] ¶ 4; that "[t]he client agency is responsible for identifying its needs, defining the scope of work, and determining funding," *id.* ¶ 5; and that AAS "does not independently generate requirements or initiate procurements absent a defined and authorized client request," *id.* She further stated that, until GSA receives a defined scope of work, an independent government cost estimate, funding, and an executed interagency agreement, "discussions remain at the planning stage and are not treated as an active procurement." *Id.* ¶¶ 6-7.

Because Abacus withdrew its motion for a temporary restraining order and a preliminary injunction, the only pending motion before the Court is the government's motion to dismiss Abacus's complaint pursuant to RCFC 12(b)(1).[3]

## II.     STANDARD OF REVIEW

The Tucker Act provides the United States Court of Federal Claims with jurisdiction over an action "by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). This jurisdictional grant "covers a broad range of potential disputes arising during the course of the procurement process . . . [including] objections related to a statutory or regulatory violation so long as these

---

[3] GDIT filed a motion to intervene in this case on February 12, 2026, Mot. [ECF 11], and the Court granted the motion on February 13, 2026, the day after the government filed its motion to dismiss Abacus's complaint, Order [ECF 14]. Due to the timing of these events, and because the government's motion to dismiss addressed the finality of the procuring agency's decision, the Court did not expect—nor did GDIT file—any briefs on this topic.

objections are in connection with a procurement or proposed procurement." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) (citation omitted). The term "procurement" is broadly interpreted "to encompass the period from the agency's determination that it requires contracted goods or services through final contract award and completion." *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 382 (2012) (citation omitted); *see also Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008) (stating that the phrase 'in connection with a procurement or proposed procurement,' as used in the Tucker Act, "by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services'" (citing 41 U.S.C. § 403(2))). "[A] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction." *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 325 (2012) (internal quotation marks omitted) (quoting *Distributed Sols., Inc.,* 539 F.3d at 1345 n.1).

If the court's jurisdiction is challenged under RCFC 12(b)(1), the non-movant must come forward with evidence establishing the court's jurisdiction by a preponderance of the evidence. *Wildflower Int'l, Ltd.*, 105 Fed. Cl. at 371 (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *George Family Trust ex rel. George v. United States,* 91 Fed. Cl. 177, 189 (2009)). "When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the [c]ourt must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of plaintiff." *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 314 (2010) (citations omitted). However, "[i]f the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction . . . the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). "In such a case, the allegations in the complaint are not controlling, . . . and only uncontroverted factual allegations are accepted as true for purposes of the motion." *Id.* (citations omitted). "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the . . . court." *Id.* at 1584 (citations omitted); *see Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) ("A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint." (citing *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999)). In this regard, "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1584 (citations omitted); *accord Scarpaci v. United States*, 178 Fed. Cl. 536, 540 (2025) ("[W]hen jurisdictional facts are contested, the Court can resolve factual disputes by weighing evidence outside the pleadings and making findings." (citations omitted)). "[T]he proper focus in determining jurisdiction are the 'facts existing at the time the complaint *under consideration* was filed.'" *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (quoting *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed. Cir. 1996)). The court must grant the motion to dismiss if it finds that it lacks jurisdiction over the claim. *Awad v. United States*, 61 Fed. Cl. 281, 283 (2004); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### III.    ANALYSIS

The government moves to dismiss Abacus's claims as unripe. Specifically, the government contends that, while USMTM "has expressed its interest in utilizing the EMITS 2 task order for follow-on services . . . . the EMITS 2 task order is owned by GSA and the decision as to whether that task order is utilized . . . lies with GSA." [ECF 24] at 3. According to the government, "no final path has been selected for follow-on work." *Id.* at 4. Additionally, the government asserts that its plan to use government resources to maintain the services after Abacus's contract expires is a short term "mitigation plan," *id.* at 4-5, and "is clearly not a decision to 'in-source' the support services currently provided by Abacus," *id.* at 5. Therefore, the government argues that "Abacus's in-sourcing claim, like its others, is not ripe." *Id.* at 5. Abacus contends that "the court should deny [the] motion to dismiss because the facts set forth in Abacus'[s] complaint show that GSA has made a final decision and that this action is ripe." [ECF 22] at 3-4 (capitalization omitted). Abacus states that the "[e]vidence of GSA's plan to move Abacus'[s] incumbent work to EMITS 2 is overwhelming." *Id.* at 2. Specifically, Abacus relies on GSA's referring of Abacus to the GDIT EMITS 2 transition manager, GSA's denial of Abacus's agency level protest, and statements by the USMTM J6 director. *Id.* at 6-8. Abacus argues that "a[] potential 'temporary gap' in contractor services [does not] demonstrate the lack of finality of GSA's decision to transition Abacus's incumbent work to EMITS 2." *Id.* at 9. The Court finds that Abacus's claims are ripe because the evidence shows that GSA and USMTM have made a final decision regarding a proposed procurement plan for the CITS support and that Abacus would experience hardship if the Court were to withhold judicial review.

"Justiciability challenges focusing on ripeness are often brought under RCFC 12(b)(1) . . . ." *Pernix Grp., Inc. v. United States*, 121 Fed. Cl. 592, 599 (2015). While "justiciability has no precise definition or scope, doctrines of standing, mootness, [and] ripeness . . . are within its ambit." *Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (citations omitted). "The justiciability doctrine of ripeness circumscribes the court's review to cases that present realized rather than anticipated or hypothetical injuries." *Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673, 678 (2009) (citing *United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 89-90 (1947)). The rationale behind the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys. v. Gardner,* 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977); *see Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1351 (Fed. Cir. 2015) ("Adherence to ripeness standards prevents courts from making determinations on the merits of a case before all the essential facts are in."). "In assessing ripeness, there are two basic factors: (1) the fitness of the issues for judicial decision[] and (2) the hardship to the parties of withholding court consideration." *Sys. Application & Techs., Inc.*, 691 F.3d at 1383-84 (internal quotation marks omitted) (citing *Abbott Lab'ys.*, 387 U.S. at 149). "Both prongs must be satisfied before [the] court may apply its adjudicative powers to a case's merits." *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1581 (citations omitted). "There is no jurisdiction to hear a case that is not ripe, and it is [the] plaintiff['s] burden to establish ripeness." *Morris v. United States*, 58 Fed. Cl. 95, 97 (2003) (citing *Suitum v. Tahoe*

9

*Reg'l Plan. Agency*, 520 U.S. 725, 735 (1997); *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)), *aff'd*, 392 F.3d 1372 (Fed. Cir. 2004).

## A.    Fitness of the Issues for Judicial Review

Abacus's claims are fit for judicial review. The fitness of an issue for judicial decision depends on "whether the challenged conduct constitutes a final agency action." *Sys. Application & Techs., Inc.,* 691 F.3d at 1384. An agency action is final—as opposed to being tentative or interlocutory in nature—if it marks the consummation of the agency's decision-making process and establishes legal rights, obligations, or consequences. *Id.* (citing *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). "A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." *Id.* at 1383 (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)); *accord CBY Design Builders*, 105 Fed. Cl. at 331 ("Generally, a case is fit for review when the legal issues presented are not ones for which the court could 'benefit from further factual development,' and the court does not risk inappropriate 'interfere[nce] with further administrative action.'" (alteration in original) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Here, the evidence shows that USMTM has made a final decision to transition the incumbent CITS support—or some portion thereof—to the GDIT EMITS 2 task order. In response to the inquiry from Abacus on October 23, 2025, GSA stated that it "anticipate[d that] some or all of the USMTM requirements may transition under an already awarded task order," [ECF 1-2] at 88-89, and suggested that Abacus contact the GDIT program manager responsible for the EMITS 2 transition for further information, *id.* at 87-88. Abacus then filed an agency-level protest with GSA on November 3, 2025, challenging GSA's planned transition of the CITS support to the EMITS 2 task order. [ECF 21-1] ¶ 33; [ECF 1-2] at 223. Next, instead of advising Abacus that no decision had been made to transition the services to the EMITS 2 task order, GSA denied the protest on the basis that transitioning the CITS support to the EMITS 2 task order would not violate CICA. [ECF 1-2] at 223-24. On January 26, 2026, GSA notified Abacus to execute its transition out plan by the expiration of its contract. [ECF 21-1] ¶ 39. Since January 26, 2026, USMTM has represented to Abacus that the CITS support will be transitioned to the EMITS 2 task order. *Id.* ¶¶ 7, 8. Furthermore, USMTM has indicated that its preferred procurement plan is to utilize the EMITS 2 task order for the CITS support and that it would pursue alternative plans only if the instant protest rendered its preferred plan "not feasible." [ECF 24-1] ¶ 6. Thus, GSA's and USMTM's representations indicate that upon expiration of Abacus's incumbent contract, the CITS support will be transitioned to the GDIT EMITS 2 task order and that the only event impeding such transition is Abacus's protest.[4]

The government argues that "despite [USMTM's] interest in EMITS 2, GSA has not yet determined that it will offer EMITS 2 as a follow-on vehicle for USMTM's requirements, in part

---

[4] While there is no single agency action in this case that consummates the decision to transition the CITS support to the GDIT EMITS 2 task order, the Court finds that the weight of the evidence supports the conclusion that GSA and USMTM have made a final decision to pursue this procurement approach. *See Ferreiro*, 350 F.3d at 1324 ("A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint." (citing *Moyer*, 190 F.3d at 1318)); *Scarpaci*, 178 Fed. Cl. at 540 ("[W]hen jurisdictional facts are contested, the Court can resolve factual disputes by weighing evidence outside the pleadings and making findings." (citations omitted)).

because it has not yet received those final requirements in support of an assisted acquisition request and in part due to continued consideration of the risk to that vehicle from further protests from Abacus." [ECF 24] at 4. Neither of these justifications render Abacus's claims unfit for judicial review. First, the government's argument that this protest is not ripe because GSA has not yet received the final requirements from USMTM is contradicted by the fact that GSA, in response to Abacus's agency-level protest, already determined that "[t]he services at issue will be performed under the existing task-order structure, using established contract types, CLIN structures, and labor categories. . . . [and that] the contemplated work remains within the original scope, period, and maximum value of the existing [EMITS 2 task order]. . . ." [ECF 1-2] at 224. Moreover, in addition to GSA's determination that the CITS support falls within the scope of the GDIT EMITS 2 task order, USMTM obtained a pricing estimate from GDIT to perform the CITS support. *See* [ECF 22-1] ¶ 10. Thus, while GSA may still be awaiting final requirements from USMTM, GSA must have sufficient requirements from USMTM to determine that the CITS support fits within the scope of the EMITS 2 task order, and USMTM must have sufficiently final requirements to obtain a price from GDIT for such services. *See Savantage Fin. Servs., Inc. v. United States*, 123 Fed Cl. 7, 28 (2015) (that the agency "must take additional steps before its [procurement plan] is fully implemented does not make the decision to forgo competition any less final"), *aff'd*, 668 F. App'x 366 (Fed. Cir. 2016).

Next, the government's argument that this protest is not ripe because of GSA's continued consideration of the legal risk posed by Abacus's protest does more to support the finding of ripeness than it does to oppose it. Both GSA and USMTM are deferring the decision to transition the CITS support to the EMITS 2 task order because of Abacus's protest. Indeed, the government states that "GSA has not yet determined that it will offer EMITS 2 as a follow-on vehicle for USMTM's requirements . . . in part *due to* continued consideration of the risk to that vehicle from further protests from Abacus." [ECF 24] at 4 (emphasis added). Similarly, USMTM states that its "preferred course of action . . . is to utilize the . . . [EMITS 2] task order for its CITS support once Abacus's contract ends" and that its alternative procurement approaches will only be utilized "[i]f . . . the transition to EMITS 2 is not feasible *due to* this bid protest." [ECF 24-1] ¶ 6 (emphasis added). Thus, it appears that the decision to transition the CITS support to the EMITS 2 task order is not tentative because the only factual development that must occur for GSA and USMTM to decide to transition the services to the EMITS 2 task order is the resolution of Abacus's instant protest. This is not the type of factual development that precludes a finding of ripeness. *See Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008) ("[A]n action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" (alteration in original) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 812 (2003))). The Court will not allow "[t]he government [to] manipulate the finality doctrine to suit its own current litigation strategies." *Sys. Application & Techs., Inc.*, 691 F.3d at 1384.

The evidence also shows that USMTM has made a final decision to utilize government resources to perform the CITS support for an undefined duration. While USMTM and GSA do not plan to extend Abacus's incumbent contract and will instead allow it to expire, [ECF 24-1] ¶ 4; [ECF 13-2] ¶¶ 23, 25, USMTM has determined that there is a continuing requirement for the services being performed under the incumbent contract, *id.* ¶ 22. To address the requirement, USMTM has decided to use "internal or external military resources . . . to address [the] potential

lapse in contractor support upon expiration of the current contract." *Id.* ¶ 22. This decision to utilize government sources to perform the CITS support is not tentative. *See Sys. Application & Techs., Inc.,* 691 F.3d at 1383. On the contrary, the evidence shows that it reflects USMTM's plan to meet its requirements after expiration of Abacus's contract. *See* [ECF 13-2] ¶¶ 23-24 (contracting officer stating that the decision to not pursue extension of Abacus's incumbent contract is based on USMTM providing interim continuity of essential IT support); *id.* ¶ 29 (contracting officer recognizing that USMTM has an "internal continuity plan"); [ECF 24-1] ¶ 7 (USMTM J6 director "recognizing a gap for some amount of time is likely inevitable, [and stating that] USMTM J6 has devised an internal mitigation plan for how it will use its existing staff to maintain operational capability once all nineteen Abacus contractor personnel depart Saudi Arabia"). Without reaching the merits of Abacus's claim, the Court views Abacus's challenge to the government's plan to in-source the incumbent services as ripe.

The fact that USMTM has identified—and could subsequently decide to pursue— alternative procurement approaches for the follow-on CITS support does not render Abacus's claims unripe. *See Ideogenics, LLC v. United States*, 145 Fed. Cl. 666, 673 (2019); *Mgmt. & Training Corp. v. United States*, 115 Fed. Cl. 26, 38-39 (2014) ("[T]he fact that [the agency] could . . . reverse its decision . . . does not render this case unripe."). Nor must the Court wait until GSA modifies GDIT's EMITS 2 task order or USMTM begins performance of the CITS support using government resources to find Abacus's claims ripe. To determine fitness, the Court merely needs evidence showing that a final decision has been made on how to obtain the services to meet the requirements and that legal consequences flow from that decision. *Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430, 447 (2017) ("The fact that the Army could change course in the future by, for example, amending or canceling the solicitation, does not render [the protester's] claim unripe." (citing *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 179, 182 (2011))). These elements are satisfied here. The evidence shows that USMTM has selected its procurement approach for the CITS support and, as a result of such approach, Abacus is precluded from competing for such procurement. Should USMTM decide to change course in the future, such change could render Abacus's claims moot, *see Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 324-25 (2015) (finding protestor's claims moot after agency action altered its prior procurement decision), but does not render Abacus's claims unripe.

### B.      Hardship to the Parties of Withholding Court Consideration

Abacus will experience hardship if the Court were to dismiss its claims as unripe. "[W]ithholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." *Caraco Pharm. Lab'ys, Ltd.*, 527 F.3d at 1295 (quoting *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)). The required showing to establish hardship in the context of a ripeness analysis is less than the required showing to establish irreparable harm in the injunctive relief context. *Sys. Application & Techs., Inc.,* 691 F.3d at 1385.

Here, the decision to transition the CITS support to the GDIT EMITS 2 task order and to utilize government resources to perform the CITS support for an undefined duration has an immediate and substantial impact on Abacus. As a result of this proposed procurement approach, Abacus will lose the opportunity to compete for the CITS support that USMTM will perform

using government resources upon the expiration of Abacus's contract. Additionally, it is conceivable—if not likely—that Abacus will not be informed of the transition of the CITS support to the EMITS 2 task order because such transition would be facilitated using a modification to the task order and presumably will not involve a solicitation or public notice. *See* FAR 5.705(b). Thus, by the time Abacus learns of such modification, GDIT will already be performing the CITS support, and Abacus would have lost the opportunity to compete for the support. It is well-established that the loss of an opportunity to compete constitutes irreparable harm in the context of injunctive relief. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." (citations omitted)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 355 (2012) (stating that the loss of an opportunity to compete is "an injury that has been recognized as constituting irreparable harm" (citation omitted)); *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 323 (2022) (collecting cases). There is no reason why such harm does not also constitute sufficient hardship when considering the ripeness of a claim. *See Savantage Fin. Servs., Inc.*, 123 Fed. Cl. at 28 (recognizing that the decision to forego full and open competition "has an immediate, substantial impact on plaintiff because plaintiff is precluded from the opportunity to compete for, and being awarded, a potentially lucrative government contract").

## IV.   CONCLUSION

Accordingly, the Court finds that Abacus's claims are ripe and **DENIES** the government's motion to dismiss [ECF 13]. The parties **SHALL CONFER AND FILE** a joint status report notifying the Court of the nature of and schedule for further proceedings **by no later than March 3, 2026**. Such notice shall include the date for filing the administrative record pursuant to RCFC Appendix C, Section VII.

Additionally, some information contained in this Opinion and Order may be considered protected information subject to the Protective Order, [ECF 15], entered on February 13, 2026. Accordingly, the Opinion and Order is **FILED UNDER SEAL**. The parties **SHALL FILE by no later than March 13, 2026**, a joint status report that: identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge

13